## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEVIN HORTON,

        Plaintiff,

    v.

MATTHEW G. MILLS, JR.,

        Defendant.

No. 4:23-CV-01768

(Chief Judge Brann)

## MEMORANDUM OPINION

### APRIL 18, 2025

A disgruntled Plaintiff contends that a Pennsylvania State Police Trooper wrongfully searched his vehicle during a traffic stop. Defendant believes his suspicion of criminal activity was justified and argues that Plaintiff consented to the search; Plaintiff believes he was racially profiled and argues that his consent was involuntary. I deny the motion for summary judgment as to the unlawful search and retaliation claims and grant it as to the equal protection and state law claims.

## I.    BACKGROUND

In October 2023, Plaintiff Kevin Horton filed a complaint against Pennsylvania State Police ("PSP") Trooper Matthew G. Mills, Jr.[1] In Counts I-III, Horton pled civil rights causes of action under Title 42 U.S.C. § 1983 for violations of the Fourth Amendment's prohibition on unreasonable searches, the First

---

[1]    Complaint, Doc. 1.

Amendment's prohibition on retaliation, and the Equal Protection Clause of the Fourteenth Amendment's prohibition on race-based discrimination.[2] Count IV pled false arrest and false imprisonment claims under Pennsylvania state law.[3] Mills filed an answer to the complaint in December 2023.[4] In November 2024, Mills filed a motion for summary judgment.[5] That motion is now ripe for disposition.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[7] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[8] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[9]

---

[2]    *Id.*
[3]    *Id.*
[4]    Affirmative Defenses and Answer, Doc. 6.
[5]    Motion for Summary Judgment, Doc. 13.
[6]    Fed. R. Civ. P. 56(a).
[7]    *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[8]    *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).
[9]    *Id.*

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[10] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[11] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[12] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[13]

Before moving to the facts, I resolve objections bearing upon the record. Under Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible evidence." "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."[14]

First, Mills cites to a PowerPoint presentation titled "looking beyond the traffic stop" in his statement of undisputed material facts ("SUMF") to explain what

---

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[11] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[12] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[13] Fed. R. Civ. P. 56(c)(3).

[14] Fed. R. Civ. P. advisory committee's note (2010).

training Mills received.[15] Horton objects to these citations in his counterstatement of undisputed material facts ("CSUMF").[16]

I agree that there is no foundation in the record to establish the exhibit's relevance.[17] No testimony was elicited that Mills had ever seen it, that it is from the year Mills was trained, or that the slides accurately represent the substance of the oral presentation at the training. Mills also never attempted to discharge his burden to show that the PowerPoint was admissible as presented or to explain the admissible form that is anticipated, despite dedicating his Reply Brief solely to objections Horton had made to other exhibits.[18] The objection is sustained and the Court shall not consider allegations relying solely upon this exhibit.[19] But the Court shall also exercise its discretion to search the record—namely, Mills's deposition transcript—for other evidence supporting the descriptions of Mills's training in the SUMF.

Second, Mills cites to four PSP Reports: the Desk Memorandum detailing the PSP's investigation into Horton's complaint regarding the traffic stop at issue in this case, and three Reports regarding prior investigations Mills was involved in,

---

[15]   SUMF, Doc. 14 ¶¶ 47-50, 52, 54, 56, 58-63.

[16]   CSUMF, Doc. 22 ¶¶ 47-50, 52, 56, 58-63.

[17]   The Court reserves judgment on whether this powerpoint would be admissible at trial; it merely observes that at this time nothing in the record connects it to Mills' training.

[18]   *See generally* Reply Brief, Doc. 25.

[19]   This does not apply to ¶51, which is based on Mills' testimony of his training and not the inadmissible powerpoint. *See* SUMF, Doc. 14 ¶51 (citing Mills Deposition, Doc. 14-1 at 15:7-12). This allegation is properly supported by a citation to the record.

attached as exhibits B, E, F, and G.[20] Horton objects to these citations, contending that these reports, too, are unauthenticated inadmissible hearsay, and that "there is no evidence that [these reports] are an accurate and complete account of the alleged incident."[21] Here, however, Mills does attempt to discharge the burden of showing that this material is admissible.[22]

The Court overrules Horton's objections to relying upon these reports. In a civil case, Federal Rule of Evidence 803(8)(A)(iii) excepts public records setting out factual findings from a legally authorized investigation from the hearsay rule, unless the opponent shows that "the source of information" or "other circumstances indicate a lack of trustworthiness."[23] And Horton makes no argument here as to the unique untrustworthiness of these reports. So they are exempted from the hearsay rules under Federal Rule of Evidence 803(A)(iii).

I now turn to the record before us.

---

[20] SUMF, Doc. 14 ¶¶5-6, 65-92; Desk Memorandum, Doc. 14-2; PSP Report regarding PA 2020-316977 ("Exhibit E"), Doc. 14-5; PSP Report regarding 2023-544356 ("Exhibit F"), Doc. 14-6; PSP Report regarding 2023-799378 ("Exhibit G"), Doc. 14-7.

[21] CSUMF, Doc. 22 ¶¶5-6, 65-92.

[22] *See generally* Reply Brief, Doc. 25.

[23] Fed. R. Evid. 803(8)(A)(iii); *Clark v. Clabaugh*, 20 F.3d 1290, 1294-95 (3d Cir. 1994) (holding that PSP Reports were admissible under this rule under the predecessor to Rule 803(8)(A)(iii), codified then at 803(8)(C)); Fed. R. Evid. 803 advisory committee's note (2011) (stating that there "is no intent to change any result in any ruling on evidence admissibility" in making minor changes in language between the prior Rule 803(8)(C) and the revised Rule 803(8)(A)(iii)).

## III.    STATEMENT OF FACTS

Trooper Matthew Mills stopped the Plaintiff, Kevin Horton, after seeing Horton commit several minor traffic infractions on the Interstate 80 highway. Horton had been driving back to New Jersey from the University of Pittsburgh, where he had visited his son Ithiel. While Horton stood at the passenger-side window of Mills's patrol car, Mills questioned him for about seventeen minutes, asked him for consent to search the vehicle eight times, and stated that the van would be impounded to apply for a search warrant, before Horton finally consented to a search which ultimately revealed no evidence of criminal activity. At its core, this case involves two dueling narratives about the traffic stop. Mills believes that at the time of the stop, he had reason to suspect that Horton was "up to no good" and lying about his travel plans to conceal criminal activity. Horton believes that he was being racially profiled and that extending the traffic stop to search his van was illegitimate.

### A.    The Traffic Stop

Horton's claims arise out of a traffic stop that occurred on January 26, 2022.[24] At this time, Trooper Mills had been employed by the PSP for approximately three years.[25] Mills receives intelligence regarding the seizures and arrests made on Interstate 80 every three months[26] and the parties agree that "Interstate 80 is a known

---

[24]    SUMF, Doc. 14 ¶¶2, 64; CSUMF, Doc. 22 ¶¶2, 64.
[25]    SUMF, Doc. 14 ¶3; CSUMF, Doc. 22 ¶3
[26]    Mills Deposition, Doc. 14-1 at 14:6-18.

drug-transportation corridor."[27] Prior to the stop at issue in this case, Mills had had experience with at least three Interstate 80 vehicle searches at which narcotics were seized after the drivers consented to searches.[28]

On January 26, 2022, Trooper Mills was parked at an Interstate 80 crossover when Horton passed his vehicle.[29] Mills noticed that Horton was "leaned back behind the B pillar" of his vehicle, which he stated was a potential indicator of a driver's guilty conscience because it demonstrates "hiding in plain sight and the psychological aspects behind it."[30] Horton denies that he was "hiding" behind his B-Pillar and indicates in a written affidavit that "due to [his] size" of being 6'3" tall

---

[27]   SUMF, Doc. 14 ¶46; CSUMF, Doc. 46 ¶46.

[28]   As discussed above, Mills has appended the PSP Reports detailing these prior searches to his brief in support of summary judgment. The Court has inspected these reports, but it looks to Mills's testimony—not the arguments of counsel based on these reports—to determine what training-and-experience-based observations Mills in fact made at the stop. In any case, though counsel points to superficial similarities, the facts arising during these stops were far afield of the present case. SUMF, Doc. 14 ¶¶ 66-69; Exhibit E, Doc. 14-5 at 8-13 (explaining that Mills was the back-up officer present for a search revealing bulk currency at an Interstate 80 traffic stop in 2020 where there was "an overpowering sweet odor of air freshener/perfume," the driver was "shaking uncontrollably," the driver and passenger had blatantly conflicting stories about their travel itinerary, and the driver offered to show officers a "picture" in support of their travel plans); SUMF, Doc. 14 ¶¶73-74, 77-79; Exhibit F, Doc. 14-6 at 11-12, 29 (explaining that Mills conducted a search revealing large quantities of heroin and fentanyl at an Interstate 80 traffic stop in 2023 where the driver of a rental car crossed the fog line several times before being pulled over, admitted he had no valid license, had a bag of heroin fall out of his pocket during a pat-down search, was traveling with four vehicle occupants with extensive criminal histories, was making a long one-day trip which he described "unsolicited," and initially resisted before consenting to the search); SUMF, Doc. 14 ¶¶84-89; Exhibit G, Doc. 14-7 at 8-10 (explaining that Mills conducted a search revealing large quantities of heroin and fentanyl at an Interstate 80 traffic stop in 2023 where the driver had been blocking his face from view, Mills observed large bags in the driver's car upon approach, and the driver offered a confusing story about the purpose of his trip).

[29]   Mills Deposition, Doc. 14-1 at 11:9-12:2.

[30]   *Id.*

and weighing 314 pounds, Horton drives with "the driver's seat in its furthest or near furthest back position, which would place [him] near to the B pillar of the minivan."[31] Trooper Mills stated that he did not consider Horton's height or the model of his van when assessing whether his seating position was an "indicator" of criminal activity.[32] The MVR footage never depicts Horton's sitting position.

From the beginning of the MVR footage until around fifteen seconds, while Trooper Mills catches up with Horton, Horton's white van gradually comes into view.[33] Mills observed him from behind for around two minutes.[34] Mills testified to observing Horton fail to remain in his lane of travel by crossing the fog or center dash lines several times; three of these instances are clearly displayed in the footage,[35] while the other two are less clearly depicted.[36] Trooper Mills testified that these traffic violations could be indicators of criminal activity because a driver could fail to remain in his lane of travel when he is "looking in the passenger side-view mirror, looking back, trying to see where we're at, if we're following them."[37] At some point during this time, Mills also clocked Horton to be speeding by 9 miles per

---

[31] Horton Affidavit, Doc. 22-2 ¶¶6-7.

[32] Mills Deposition, Doc. 14-1 at 12:2-19.

[33] MVR Footage, Doc. 14-3 at 0:00—0:15.

[34] MVR Footage, Doc. 14-3 at 0:15-2:42.

[35] MVR Footage, Doc. 14-3 at 0:38, 0:54, 1:24; Mills Deposition, Doc. 14-1 at 27:19-23; 28:11-20; 29:12-17.

[36] MVR Footage, Doc. 14-3 at 0:49, 1:44; Mills Deposition, Doc. 14-1 at 27:25-28:10; 29:21-14. It's not actually clear from the deposition if Mills thought Horton committed this infraction at the latter-timestamped footage. But that's irrelevant to resolving this motion because only one traffic infraction was necessary to justify the stop.

[37] Mills Deposition, Doc. 14-1 at 12:20-13:1.

hour, driving 74 miles per hour in a 65 mile-per-hour zone.[38] Around 2:45 into the MVR footage, Trooper Mills pulls up even with Horton and can see him.[39] The parties dispute Mills's motivations, but they agree that Mills had decided to stop Horton after seeing him.[40] By 3:26 in the MVR footage, Mills had pulled Horton over and both vehicles had come to a stop.[41]

### B.    Mills Approaches Horton's Van

Horton waited in his van for about a minute while Trooper Mills typed notes and called in the stop.[42] Mills ran the vehicle's license plate in his database and learned that the vehicle was a rental; the vehicle also had Florida license plates.[43] While he approached Horton's van, Trooper Mills looked through the vehicle's windows, which Mills stated he does "during every car stop;" the dash camera footage reflects that Mills only scanned inside of the van for a moment while approaching Horton's passenger side window.[44]

---

[38]    SUMF, Doc. 14 ¶5; CSUMF, Doc. 14 ¶5; Mills Deposition, Doc. 14-1 at 30:24-31:10; Desk Memorandum, Doc. 14-2 at 9.

[39]    Mills Deposition, Doc. 14-1 at 31:22-32:2.

[40]    *Compare* SUMF, Doc. 14 ¶6 (asserting that Mills decided to stop Horton "[b]ased on his personal observations."); *with* CSUMF, Doc. 22 ¶6 (contending that Mills decided to stop Horton after "seeing Plaintiff was a black man"); Mills Deposition, Doc. 14-1 at 32:7-14.

[41]    MVR Footage, Doc. 14-3 at 2:45-3:26.

[42]    MVR Footage, Doc. 14-3 at 3:26-4:33; Mills Deposition, Doc. 14-1 at 35:22-39:12.

[43]    SUMF, Doc. 14 ¶8; CSUMF, Doc. 14 ¶8; Mills Deposition, Doc. 14-1 at 35:1-15.

[44]    SUMF, Doc. 14 ¶9; CSUMF, Doc. 14 ¶9; Mills Deposition, Doc. 14-1 at 40:21-25; MVR Footage, Doc. 14-3 at 4:33-4:45.

As soon as Mills reaches Horton and says "hello," Horton asks: "why did you look into my car window? Do you think I am running drugs?"[45] Mills perceived this question to be a "red flag" because he has "never had somebody say that" and suspected that Horton was asking this question as an "intimidation tactic."[46] Horton states in an affidavit that he "thought [Mills] was looking for something that he could say contained illegal drugs" "[b]ased on [his] belief that black men are often profiled and subjected to stops and searches based primarily on their skin color," and his question was meant to communicate this to Mills.[47]

Mills and Horton briefly discuss other reasons why Mills might want to peer into Horton's vehicle; Mills states that he wants to make sure no one "jumps out at" him from the van,[48] and Horton states that Mills "could be pulling [him] over for other reasons."[49] In his deposition, Mills agrees that Horton "insinuate[d] there would be other reasons why [he is] pulling [Horton] over," such as that Mills "didn't have a reason to stop him."[50] When asked whether he presumed that Horton "meant

---

[45]   The parties proffer slightly different versions of Horton's statement. *Compare* SUMF, Doc. 14 ¶10 ("why did you look into my car window? Do you think I am running drugs?"); Mills Deposition, Doc. 14-1 at 22:7-8 (same) *with* CSUMF, Doc. 22 ¶10 ("Why are you looking in my car, are you looking for drugs?); Horton Affidavit, Doc. 22-2 ¶7 (same). Having reviewed the footage, the Court finds it to be a very close question as to whether Horton's version is "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007). I do not decide this question because Horton's Fourth Amendment claim prevails under either version of this statement.

[46]   Mills Deposition, Doc. 14-1 at 22:4-23:18.

[47]   Horton Affidavit, Doc. 22-2 ¶7.

[48]   MVR Footage, Doc. 14-3 at 4:48-5:00.

[49]   *Id.* at 5:00—5:05. Mills responds "what do you mean?" Horton's response is inaudible. *Id.* at 5:05-5:08.

[50]   Mills Deposition, Doc. 14-1 at 41:17-42:1.

because he was black," Mills said: "he could have. I don't know exactly why."[51] Mills stated in his deposition that Horton's "pre-stop behavior" of "hiding" behind the van's b-pillar, crossing the fog line, occupying a rental vehicle, and asking why Mills was looking in the vehicle created a "red flag" which "summoned [him] to want to have more of a conversation with Mr. Horton" to get more information.[52]

At this point, Mills went about the ordinary business of a traffic stop, introducing himself and stating that he stopped Horton because he was speeding by 9 miles per hour.[53] In response to Mills's statement that he had been speeding, Horton said: "listen, I'm going from Pittsburgh to Jersey. Five hour drive. Coming from my son, University of Pitt. [Inaudible] . . . it's a five hour ride."[54] Horton expressed surprise at being stopped when he was not driving "over eighty."[55]

Mills testified that if a suspect "tell[s] you something right off the bat unsolicited, it raises [his] suspicion based off of [his] training and experience."[56] He viewed Horton's voluntary description of where he was "coming from and going in the first two minutes of the stop" as indicative of a "cover story," which based on his training, is "a narrative to make you feel like they're not up to no good."[57] When asked whether it mattered that Horton was describing his long trip to explain why he

---

[51]   *Id.* at 42:2-4.
[52]   *Id.* at 42:6-43:1.
[53]   MVR Footage, Doc. 14-3 at 5:08-5:14.
[54]   SUMF, Doc. 14 ¶12; CSUMF, Doc. 22 ¶12; MVR Footage, Doc. 14-3 at 5:14-5:30.
[55]   MVR Footage, Doc. 14-3 at 5:30-5:32.
[56]   Mills Deposition, Doc. 14-1 at 46:1-7.
[57]   *Id.* at 45:13-45:25.

was speeding, Mills stated: "it could be that reason or it could be the other reason."[58] When asked whether it is "typical that people who are transporting drugs speed," he stated that "[t]hey can," but he does not "run narcotics, so [he] do[esn't] know what's going on inside these people's minds and what their tactics are."[59]

Horton continued discussing the fact that he had only been driving nine miles over the speed limit, and Mills stated that he would probably give Horton a warning.[60] Mills checked Horton's license, the vehicle's registration, and the rental agreement, learning that Horton rented the vehicle in his own name.[61] Mills stated in his deposition that driving a vehicle rented by a third party was suspicious because it cannot be "traced to [the driver] specifically," but when asked whether this vehicle being rented in Horton's name made him less suspicious, he stated: "I didn't say that it wasn't. It could be still. It doesn't matter."[62] Horton then continued stating that the drive was a "five-hour ride," and Mills again reassured him that he would not give him a ticket.[63] Mills asked again whether "everything [was] good on [Horton's] license," and Horton became frustrated that he had been asked this question twice: "I'm from old school. When I told somebody no, that meant no."[64]

---

[58]   Mills Deposition, Doc. 14-1 at 46:11-16.
[59]   *Id.* at 46:19-47:2.
[60]   MVR Footage, Doc. 14-3 at 5:32-5:52.
[61]   *Id.* at 5:52-6:30
[62]   Mills Deposition, Doc. 14-1 at 49:14-50:7. Horton, who was apparently present at the deposition, then interjects: "Either way, wow." *Id.* at 50:8.
[63]   MVR Footage, Doc. 14-3 at 6:00-6:08.
[64]   *Id.* at 6:30-6:55.

### C.    Mills asks Horton to Exit the Vehicle

At this point, Mills asked Horton to exit his vehicle and continue speaking near his patrol car, "and then I'll write you a warning and get you on the way."[65] Horton initially refused, and Mills responded: "Well just so you know, *Commonwealth v. Mimms*, you can ask the operator out of the car. Okay? So I'm asking you to come out and speak with me. Case law says that you can do that."[66] Mills stated in his deposition that while he did intend on giving Horton a warning, he "wanted to continue doing these checks," including, "based off of all these things that have already been presented, questioning, getting more information," to decide whether to search Horton's vehicle.[67] Mills stated in his deposition that he asked Horton to stand by his vehicle so that he could question Horton while writing his warning and therefore not unlawfully extend the stop.[68]

Horton then notifies Mills that he is putting his wife on the phone while Mills speaks to him.[69] Horton gets out of the van, and he and Mills stand behind it.[70] Horton refuses Mills's request to conduct a pat-down search but agrees to lift up his jacket to show that he has no weapons.[71] Mills then steps back into his patrol car, and

---

[65]    SUMF, Doc. 14 ¶14; CSUMF, Doc. 22 ¶14; MVR Footage, Doc. 14-3 at 6:57-7:00.
[66]    7:00-7:23; SUMF, Doc. 14 ¶¶14-16; CSUMF, Doc. 22 ¶¶14-16.
[67]    Mills Deposition, Doc. 14-1 at 47:17-48:9, 49:1-5.
[68]    *Id.* at 48:3-9; 51:12-13.
[69]    MVR Footage, Doc. 14-3 at 7:27-7:55.
[70]    *Id.* at 7:55-8:00.
[71]    *Id.* at 8:00-8:15.

Horton walks over to the passenger side window.[72] As Horton and Mills move to Mills's car, Horton points out that he does not see a body camera on Mills, and Mills informs him that the MVR camera is recording footage of the stop.[73] Horton also states twice that he is "in your corner" when officers are "doing the right thing," but that "when they're doing the bullshit, that's when I got a problem."[74] Mills states that he is "just doing [his] job," but Horton responds: "They all say that, but, I think you're putting me in the system, that's what you're doing out here."[75]

## D.    Mills Asks Horton Questions While Writing His Traffic Warning

Mills believed that Horton was reciting a "cover story," so he interrogates Horton's travel itinerary and points out various inconsistencies. For his part, Horton continues to vocalize his suspicion of Mills and of law enforcement officers in general, while also offering information to reduce Mills's suspicion.

When told that he was "going all over the road," Horton explains that he is a little tired and starts discussing his trip with Mills.[76] Horton stated that he drove to Pittsburgh yesterday to visit his son and is driving back today.[77] According to Mills, he has received training that criminal voyages are quick turn-around trips.[78] Horton also points out the camera in Mills's car, which Mills states is for both of their safety,

---

[72]  *Id.* at 8:36-8:50.
[73]  *Id.* at 8:28-8:36.
[74]  *Id.* at 8:15-8:28; 8:50-9:00.
[75]  *Id.* at 9:00-9:07.
[76]  *Id.* at 9:07-9:20.
[77]  *Id.* at 9:20-9:34.
[78]  SUMF, Doc. 14 ¶51; CSUMF, Doc. 22 ¶51; Mills Deposition, Doc. 14-1 at 15:7-12.

and Horton responds: "Right, 'cause old school, they took your word for it, until this came along. Now that's my witness."[79] Horton went on to contend that the PSP makes it "difficult" to obtain video footage and that they should allow the attorneys to access such footage right away.[80] He continued that officers have "too much power" and talked about "B.S." reasons for conducting stops.[81]

Mills continued the previous conversation about Horton's itinerary, asking whether Horton had been in Pittsburgh, and Horton replied: "that's really not your business, but I'm just saying that for you—for your . . . so you understand that I am not that guy you should be suspicious of."[82] Mills responded: "Yeah, I just don't know why you're trying to convince me of that . . . . Why do you think I am suspicious?"[83] "Because that's the nature of the job," Horton said. "Suspect everyone."[84] Horton then tells Trooper Mills that his brothers work in law enforcement and that he knows the nature of the job.[85] Horton says that the "advice [he] give[s] young guys like [Mills]" is that if they are "afraid of everybody" they "can't do the job effectively."[86] Mills asks if Horton thinks he's afraid of him, and Horton responds that he was just speaking "in general . . . you see, here you go . . .

---

79  MVR Footage, Doc. 14-3 at 9:20-9:49.
80  *Id.* at 9:50-10:45.
81  *Id.* at 10:45-11:00.
82  SUMF, Doc. 14 ¶¶19-20; CSUMF, Doc. 22 ¶¶19-20; MVR Footage, Doc. 14-3 at 11:16-11:25.
83  SUMF, Doc. 14 ¶21; CSUMF, Doc. 22 ¶21; MVR Footage, Doc. 14-3 at 11:25-11:33.
84  MVR Footage, Doc. 14-3 at 11:33-11:42.
85  SUMF, Doc. 14 ¶22; CSUMF, Doc. 22 ¶22; MVR Footage, Doc. 14-3 at 11:42-12:00.
86  *Id.* at 12:04-12:33.

you personalize everything now."[87] "There's a lot of dudes that are scared though," Horton continues, "and I grew up with them . . . and then they became cops, and I was like, bro, I hope I don't ever get . . . 'cause they're afraid."[88]

"I sit in my car all day, so I try to have a conversation with people," Mills begins, reorienting the conversation back to Horton's travel itinerary; "I was just trying to see how you're doing today . . . where you're headed to, where you're coming from."[89] Mills asked about Horton's son, and Horton responded that his son is on the basketball team at University of Pittsburgh.[90] When asked what his son is studying, Horton laughs and responds: "I don't know what he's studying, but I know he's hooping."[91] Mills asks: "You don't know what your son is studying?" Horton replies that his son has "changed so many times it ain't even funny . . . they start out with one thing, then they change to something else."[92]

Mills asks for the name of Horton's son; Horton responds, "you want to look it up? I'll show you a picture of him," while Mills says, "I have no reason to look it up, I just asked what his name was."[93] "No no, I'm gonna show you a picture of him," Horton says while looking at his phone.[94] Mills types in silence while Horton

---

[87] *Id.* at 12:33-12:47.
[88] *Id.* at 12:45-13:00.
[89] *Id.* at 13:12-13:25.
[90] *Id.* at 13:29-13:39.
[91] *Id.* at 13:39-13:45.
[92] *Id.* at 13:45-13:57.
[93] *Id.* at 13:57-14:13.
[94] *Id.* at 14:08-14:12.

finds the picture, and about thirty seconds later, he shows Mills internet search results featuring pictures of a young man named Ithiel Horton on the University of Pittsburgh basketball roster.[95] Mills confirms that Horton had only visited for the day before and of the stop, and asks, "does he let you stay in the dorm?"[96] "I rent out a hotel, right on campus," Horton responds.[97] Mills then asks why Horton's wife is not with him and what whether Horton was employed.[98] Since Mills has been typing Horton's written traffic warning for over five minutes at this point, Horton asks if Mills is writing "a three-page college term paper" and whether this is just a warning.[99]

Mills then continues asking Horton questions; he notes that Horton has no luggage with him, and Horton states that he was only there for one day and packed a small bag.[100] Mills then asks whether Horton has anything illegal in the car, such as gun, knives, or large amounts of currency, and Horton indicates that he does not and begins arguing with Mills about why he would be "inclined" to think Horton's car contains illegal contraband.[101]

Mills asks: "If I wanted to check the car, would I be able to though?"[102]

---

[95]  *Id.* at 14:12-14:46 (search results visible at 14:41); Horton Affidavit, Doc. 22-2 ¶12(a).
[96]  MVR Footage, Doc. 14-3 at 14:44-15:04.
[97]  *Id.* at 15:04-15:06; SUMF, Doc. 14 ¶24; CSUMF, Doc. 22 ¶24.
[98]  *Id.* at 15:04-15:40.
[99]  *Id.* at 15:40-16:26.
[100]  *Id.* at 16:19-16:26.
[101]  *Id.* at 16:32-17:25.
[102]  *Id.* at 17:22-17:28.

"No. No. No." Horton states, shaking his head.[103]

Mills says that he is "about done here" before asking: "did you at least stay up in a nice hotel though?"[104] "Actually, I just stayed with him last night," Horton responded, "'cause it was one night."[105] To Mills this was significant. Mills stated that Horton had previously indicated that he stayed in a hotel; Horton maintained that he usually does stay at a hotel, but just did not stay there this time.[106] This argument continued for several minutes, with Horton stating that Mills was "trying to catch [him] in something," and that he "wants [Mills] to believe [him]," and Mills stating that Horton had "switched [his] story" and  "tripped [himself] up," before asking Horton, "[w]hy are you trying to make me believe you so bad?"[107]

Mills then asks if Horton and his son did "anything fun," and Horton replied that they did not.[108] "You want to talk to him?" Horton asked.[109] "Yeah, put him on," Mills replied.[110] "I want you to cheer for him, too, they play Boston College on Saturday," Horton added.[111] Around this time—at 20:30 in the dash camera footage—Mills hands Horton his written warning.[112]

---

[103] *Id.* at 17:28-17:32.
[104] *Id.* at 17:32-17:40.
[105] *Id.* at 17:38-17:44.
[106] *Id.* at 17:44-18:09.
[107] *Id.* at 17:44-19:30.
[108] *Id.* at 19:30-19:54.
[109] *Id.* at 19:54-19:56.
[110] *Id.* at 19:56-20:00.
[111] *Id.* at 20:17-20:21.
[112] *Id.* at 20:30.

### E.    Mills Continues Asking Questions After Handing Horton the Warning

When Horton's son picks up the phone, "Maji" appears as the contact name.[113] Horton's son confirms that he can hear, and Horton states: "A trooper got me pulled over over here."[114] "No way," Horton's son responds as the two laugh.[115] "And he's asking me a bunch of questions."[116] "That doesn't say Ithiel," Mills interjects, "it says Maji."[117] "That's his middle name, Semaj," Horton explains.[118] "So I showed him a picture of you," Horton continues, "University of Pittsburgh and everything. He's kind of believing me about eighty percent, but there's about twenty percent of him that don't believe me, so. But I think in the end, I think it'll be ok in the end. I told him you've got a game on Saturday at Boston—"[119]

"Hang up," Mills states. "Hang up the phone."[120] "Oh, I'm done?" Horton asks.[121] "Yeah," Mills responds, and Horton hangs up the phone.[122] "Had enough of me, right?" Horton asks, laughing.[123] "Yeah," Mills responds, "I think you're doing

---

[113]  *Id.* at 20:57.
[114]  *Id.* at 21:20-21:24.
[115]  *Id.* at 21:24-21:28.
[116]  *Id.* at 21:28-21:33.
[117]  *Id.* at 21:33-21:35.
[118]  *Id.* at 21:35-21:40.
[119]  *Id.* at 21:40-22:00.
[120]  *Id.* at 22:00-22:03.
[121]  *Id.* at 22:03-22:06.
[122]  *Id.*
[123]  *Id.* at 22:06-22:08.

a lot of convincing and you're telling me a lot of bullcrap is what I think."[124] "You thought I was, right?" Horton replies.[125]

"Yeah, so my question is, you're not gonna let me check the car?" Mills asks.[126]

"No," Horton states while shaking his head.[127]

Mills asks again if Horton has "a small amount of something in there," and Horton states that he does not but states that he will allow the search if he can watch Mills: "I'll let you check. I'll be right there with you. Making sure you don't—"[128]

"Ok, I've gotta get another Trooper here to help me out, though," Mills replies; "I'm asking if I can check the car."[129] "You're actually taking it too far now, to be honest with you," Horton says, "because I've been very up front with you. I showed you my license, I showed you my rental, my name is on the rental."[130] "Well look, I'm a little suspicious man, you're kind of lying to me," Mills states.[131]

"I'm just asking, are you gonna let me check the car?" Mills asks again.[132]

Horton asks again whether he can watch Mills if he checks the car, and Mills states that Horton has to stand away from Mills with the other police officer when

---

[124] *Id.* at 22:08-22:14.
[125] *Id.* at 22:14-22:15.
[126] *Id.* at 22:15-22:19.
[127] *Id.* at 22:20-22:22.
[128] *Id.* at 22:22-22:30.
[129] *Id.* at 22:29-22:34.
[130] *Id.* at 22:34-22:42.
[131] *Id.* at 22:42-22:45.
[132] *Id.* at 22:51-22:53.

he arrives.[133] "I really don't want you checking," Horton says, "because now you're getting upset."[134] "I'm not getting upset," Mills replies, "I have reasonable belief that you're up to no good, that's what I think."[135] Horton asks if Mills is suspicious "just because [he is] talking to [Mills] and being nice [to him]," and Mills says he does not have to explain the reason for his suspicion and asks for consent again.[136]

Mills then gives Horton an ultimatum: "There's a couple of ways you can go about this. It's either you say yes or no. If you say no, I can, um, we can impound the vehicle and apply for a search warrant."[137] In his deposition, Mills stated that he "did misspeak" here and that before impounding the vehicle, he "would have had to have a K9 come to the scene and do an exterior sweep," and that "without the K9," he would not "have enough for a warrant," but that "you could still apply . . . based off reasonable suspicion . . . [of] criminal activity."[138]

"Here's what I don't want," Horton states, "I want to be able to make sure nothing's planted in there."[139] "Nothing's gonna be planted in there," Mills replies.[140] "I think you think I was lying about the hotel thing," Horton states, "so what I'm gonna do—" "listen, I don't want you to—" "I'm gonna show you the bill

---

[133]  *Id.* at 22:53-22:57.

[134]  *Id.* at 23:07-23:08.
[135]  *Id.* at 23:08-23:16.
[136]  *Id.* at 23:16-23:29.
[137]  *Id.* at 23:29-23:40.
[138]  Mills Deposition, Doc. 14-1 at 71:15-72:7.
[139]  MVR Footage, Doc. 14-3 at 23:40-23:47.
[140]  *Id.* at 23:47-23:49.

from the last time I stayed there."[141] "Well that doesn't help me for this time," Mills says.[142] Horton again explains why he usually stays at the hotel when visiting his son.[143]

"Gotcha man," Mills replies, "but hey, what I'm talking about though, now, is consent to search the vehicle, okay? Yes or no."[144]

"Let me put my Facebook on now," Horton states, "because it's just, I don't understand why we're here, cause you think I got drugs on me. I ain't never used drugs."[145] Horton and Mills argue again about why Mills would want to search the van, with Mills reiterating that he believes Horton "might be up to something."[146]

"That's why I'm asking you for consent. So, it's yes or no."[147]

Horton and Mills then talk about whether Mills has reasonable suspicion.[148] "I gotta go to Facebook live or something," Horton says, "just to make sure everybody's on the up and up. Is that ok? You have yours, can I have mine?"[149] Mills states that he generally does not let people on the phone during traffic stops, but that

---

[141] *Id.* at 23:49-24:02.
[142] *Id.* at 24:02-24:04.
[143] *Id.* at 24:04-24:16.
[144] *Id.* at 24:16-24:23.
[145] *Id.* at 24:23-24:32.
[146] *Id.* at 24:42-25:00.
[147] *Id.* at 25:00-25:10.
[148] *Id.* at 25:10-25:20.
[149] *Id.* at 25:20-25:28.

Horton can request a copy of the footage.[150] Horton then states that he is receiving a call from his wife.[151]

"That's fine," Mills replies; "I'm asking are you gonna give me consent to search?"[152]

At this point, Horton finally relents, and gives consent to search.[153] Horton then tells Mills that he had been in Pittsburgh for his son's court date for a guilty plea to disorderly conduct, Mills asks Horton to "be honest" with him, and Horton said that he "was being honest" and "ain't gotta tell [him] everything."[154] Mills and Horton continue arguing about the stop, with Horton discussing unjustified police stops he had read about online, until the other trooper arrives and Mills searches Horton's car.[155] The search of Horton's car turned up no evidence of criminal activity.[156] After the search, Horton states that he "need[s] a copy of everything here" because the stop was "not right," refuses to shake Mills's hand, states that he was stopped because he is "a brotha' . . . with a Florida license plate," and claims that police officers "infringe on constitutional rights."[157]

---

[150] *Id.* at 25:28-25:58.
[151] *Id.* at 25:58-26:00.
[152] *Id.* at 26:00-30:12.
[153] *Id.* at 26:03-26:06.
[154] *Id.* at 28:45-30:16.
[155] *Id.* at 30:16-32:30.
[156] *Id.* at SUMF, Doc. 14 ¶44; CSUMF, Doc. 22 ¶44.
[157] MVR Footage, Doc. 14-3 at 38:31-41:22.

## IV.    ANALYSIS

Horton brings four claims against Mills based on his conduct at the traffic stop. Count IV of Horton's complaint alleges a state law claim for false arrest or false imprisonment.[158] But Horton concurs in the dismissal of this claim because it is barred by Pennsylvania statute,[159] so Count IV is dismissed.

The three remaining counts are brought via 28 U.S.C. §1983, which authorizes private rights of action for violations of the federal Constitution under color of state law. Count I claims that the search violated the Fourth Amendment; Count II claims that Mills violated the First Amendment; and Count III claims that the stop violated the Equal Protection Clause of the Fourteenth Amendment.[160]

### A.    Fourth Amendment

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and generally requires a warrant obtained upon probable cause for a search to be considered reasonable.[161] A traffic stop is a "seizure" under the Fourth Amendment[162] which, consistent with the investigatory detention framework set out in *Terry v. Ohio*,[163] may be carried out without a warrant

---

[158]  Complaint, Doc. 1 at 7.
[159]  Brief in Opposition, Doc. 23 at 17-18.
[160]  Complaint, Doc. 1 at 4-6.
[161]  U.S. Const. amend. iv.
[162]  *Heien v. North Carolina*, 574 U.S. 54, 60 (2014).
[163]  391 U.S. 1 (1968).

"when the officer has reasonable, articulable suspicion that criminal activity is afoot."[164] "In *Whren v. United States*, the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop,"[165] so long as the officer observed the violation prior to initiating the stop.[166] Horton never disputes the lawfulness of this stop and it is adequately supported by the technical traffic code violations shown in the record, based on Mills's observations that Horton was speeding and occasionally failed to stay in his lane of travel. The parties do, however, dispute whether the stop was extended, whether Mills had reasonable suspicion or probable cause, and whether Horton's consent to search was voluntary.

The record lays bare that this stop had been extended by the time Horton consented to search. In *Rodriguez v. United States*, the Supreme Court held that a "police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."[167] This so-called "*Rodriguez* moment" occurs at the point in time "when the stop was measurably extended" beyond its mission; even "a *de minimis* extension" from the "basic mission of investigating a traffic violation" qualifies.[168] Here, Horton did not consent to the search until almost six minutes after Mills handed him his written

---

[164] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[165] *United States v. Mosley*, 465 F.3d 249, 252 (3d Cir. 2006).

[166] *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012).

[167] *Rodriguez v. United States*, 480 U.S. 348, 351 (2015).

[168] *United States v. Stewart*, 92 F.4th 461, 467 (3d Cir. 2024); *United States v. Hurtt*, 31 F.4th 152, 160 (3d Cir. 2022).

warning, on Mills's eighth request for consent.[169] And if Mills intentionally dragged his feet during the traffic stop as a pretextual tactic to justify asking unrelated questions, the *Rodriguez* moment could have occurred even earlier than that.[170]

If reasonable suspicion was lacking at the applicable *Rodriguez* moment, this would weigh towards showing the involuntariness of Horton's consent.[171] But I need not reach the reasonable suspicion issue. Even if the traffic stop was lawfully extended for investigatory purposes, there is at least an issue of fact (1) as to whether probable cause existed to search Horton's vehicle and (2) as to whether Horton's consent to search was voluntary or coerced. Regardless of whether the stop was lawfully or unlawfully extended, then, a reasonable factfinder could conclude that Horton should prevail on his Fourth Amendment unlawful search claim.

---

[169]  MVR Footage, Doc. 14-3 at 20:30; 26:03.

[170]  *Id.* at 3:26 (About 17 minutes prior to issuing the written warning, Mills stops Horton); 4:45 (About 16 minutes prior to issuing the written warning, Mills asks Horton to step out of the vehicle); 9:07 (About 11 minutes prior to issuing the written warning, Mills begins speaking with Horton at Mills's passenger window); 20:30 (Mills finally issues the written warning). Horton himself seemed to believe that Mills was writing the citation for an unusually long time, asking whether he was writing a "three-page college term paper." *Id.* at 15:40-15:50. *See United States v. Clark*, 902 F.3d 404, 410 n.3 (3d Cir. 2018) (quoting *Rodriguez*, 575 U.S. at 357) (Explaining that since the "'critical question . . . is not whether the [inquiry] occurs before or after the officer issues a ticket, . . . but whether [it] prolongs . . . the stop,'" any claim that "the stop was not yet over because no ticket had been issued falls short."); *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012) ("Because a crafty officer, knowing this rule, may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded, we also treat the unreasonable extension of a not-yet-completed traffic stop as a seizure."); *United States v. Johnson*, 93 F.4th 383, 388 (7th Cir. 2024) (explaining that "[a] case therefore becomes problematic under *Rodriguez* only when an officer, having no legal basis to keep a suspect in place, drags her feet during a traffic stop to give a trained dog time to arrive.").

[171]  *See United States v. Luna*, 76 F.App'x 411, 414 (3d Cir. 2003) (explaining that the Court must look to various factors to analyze whether an impermissible seizure has tainted the consent).

### 1.    Probable Cause to Search

Unlike the Pennsylvania Constitution,[172] the Fourth Amendment to the United States Constitution has been held to incorporate a categorical "automobile exception," authorizing the warrantless search of automobiles upon probable cause.[173] Accordingly, whether or not Horton voluntarily consented is irrelevant if Mills had probable cause to search his car by that point in any event.[174] I shall therefore begin by explaining why there is at least an issue of fact that Mills lacked probable cause before turning to the voluntariness question here.[175]

"Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed, and that evidence bearing on that offense will be found in the place to be searched."[176] The Court evaluates "the events which occurred leading up to the . . . search, and then . . . [decide] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause."[177] "[P]robable cause is a fluid concept – turning on the assessment

---

[172] *Commonwealth v.* Alexander, 243 A.3d 177, 180 (Pa. 2020).

[173] *Collins v. Virginia*, 584 U.S. 586, 591 (2018).

[174] The probable cause determination is also relevant to the First Amendment retaliation claim.

[175] Mills generically states in briefing that there was "reasonable suspicion and probable cause" despite the threshold for probable cause being greater and he seems to conflate the two standards. His briefing and authorities are tailored towards the reasonable suspicion question.

[176] *Safford Unified Sch. Dist. #1 v. Redding*, 447 U.S. 364, 370 (2009) (quoting *Brinegar v. United States*, 338 U.S. 160, 175-176 (1949)) (cleaned up).

[177] *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."[178] Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity;"[179] it requires "more than bare suspicion" but "less than evidence which would justify conviction."[180] At summary judgment, rather than "exclud[ing] from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider," "we view all such facts and assess whether any reasonable jury could conclude that those facts . . . did not demonstrate a 'fair probability' that a crime occurred."[181] This determination is "necessarily fact intensive and it will usually be appropriate for a jury to determine whether probable cause existed."[182]

The probable cause inquiry is objective, which narrows the field of vision in two relevant respects. Mills's own admission that he did not believe he had probable cause[183] is irrelevant; but so too are his subjective beliefs that Horton was "up to no good."[184] The latter requires some elaboration. "[S]ubjective belief may still be

---

[178] *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

[179] *Id.* at 243-44, n.13.

[180] *Brinegar*, 338 U.S. at 175.

[181] *Dempsey*, 834 F.3d at 468.

[182] *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993).

[183] Mills Deposition Transcript, Doc. 14-1 at 71:24-72:3 ("Q: Without the K9, would you have enough for a warrant? A: Without the K9, no, it would just be another tool in the bag, it would be another piece of the puzzle. You could still apply.").

[184] *United States v. Donahue*, 764 F.3d 293, 302 (3d Cir. 2014) (quoting *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991)) ("Just as a subjective belief by the arresting officer would not establish probable cause where none existed, a subjective belief by the arresting officer cannot destroy probable cause where it exists.").

relevant in a probable cause inquiry to the extent that it reveals facts material to a probable cause determination."[185] "[C]ourts recognize the particular ability of law enforcement officers, based on training and experience, 'to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."'"[186] But "[t]here are limits, however, to how far police training and experience can go towards finding latent criminality in innocent acts."[187] Officers must lay bare the logical throughline connecting their training and experience to the facts of the case. If they cannot articulate that logical connection, the perfunctory invocation of training and experience to say something is "suspicious" carries little weight, even in the reasonable suspicion context.[188] And so an officer's training and experience, rather than being talismanic, must have some explanatory power to garner judicial deference.

This principle becomes important here because Mills appeals to his training and experience throughout his deposition, often with reasonable, experience-based

---

[185] *Id.*

[186] *United States v. Green*, 897 F.3d 173 (3d Cir. 2018) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[187] *Johnson v. Campbell*, 332 F.3d 199, 208 (3d Cir. 2003).

[188] *See, e.g.*, *id.* at 210-11 (police officer's statement that she was "suspicious" of plaintiff's commonplace mannerisms, including drinking coffee, clipping through a newspaper, pacing, and rubbing his head, was "nothing more than unparticularized hunches"); *Brown v. Texas*, 443 U.S. 47, 49 (1979) (police officer may not detain someone based on the assertion that they "looked suspicious" in a high-crime area); *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) ("Whether you stand still or move, drive above, below or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.").

explanations. But those explanations seem to vanish when Mills insists that other facts do not diminish Horton's suspiciousness. Mills astutely observes, for example, that drug traffickers tend to use rental vehicles, often rented through third parties, because they are less traceable.[189] But when asked whether it cut in Horton's favor that he had rented the van in his own name, Mills stated: "I didn't say that it wasn't. It could be still. It doesn't matter."[190] The Court will not simply defer to unexplained assertions that all behaviors operate as a one-way ratchet moving towards suspicion. As with any training-or-experience-based rationale, the content of Mills's explanation matters. "Because 'the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.'"[191]

In sum, Mills points to the following evidence: (1) that Horton was traveling on Interstate 80 from Pittsburgh to New Jersey; (2) that Horton was driving a rental car; (3) that Horton was taking an overnight trip from New Jersey to Pittsburgh and back; (4) that Horton was "hiding" behind the b-pillar in his car; (5) Horton's

---

[189] Mills Deposition, Doc. 14-1 at 49:14-25.

[190] *Id.* at 50:3-7; Likewise Mills offers a compelling experience-based explanation of how a cover story might manifest through an unprompted explanation of a driver's travel itinerary at a traffic stop. But when asked whether Horton was "prompted" to explain his long drive by Mills's statement that Horton had been speeding, Mills states: "I mean, it could be on both ends, it could be that reason or it could be the other reason." *Id.* at 45:13-46:16. Likewise when asked whether a drug trafficker trying to evade detection would be likely to speed, Mills appeals to his *lack* of experience. "I don't run narcotics, so I don't know what's going on inside these people's minds and what their tactics are." *Id.* at 46:19-47:2.

[191] 2 W. LaFave, J. Israel, N. King & O. Kerr, Criminal Procedure § 3.3(b) (4th ed. 2024) (quoting *Bigford v. Taylor*, 834 F.2d 1213, (5th Cir. 1988)).

generally confrontational demeanor, including when Horton immediately asked Mills if he thought Horton was "running drugs" as Mills approached his car; (6) that Horton did not want Mills to be suspicious of him; (7) that Horton attempted to diminish Mills's suspicion by being forthcoming with his travel plans, suggesting a "cover story;" and (8) two alleged inconsistencies in Horton's explanation of his travel plans. I shall review the significance of each fact in isolation and then turn to the overall assessment of probable cause. This evidence may or may not be sufficient to support reasonable suspicion, but it falls far below the kind of evidence generally mustered to support probable cause. Mills was right to state in his deposition that probable cause was lacking here.

The first set of facts Mills points to relate to the circumstances surrounding Horton's trip. First, Horton was traveling on Interstate 80 from Pittsburgh to New Jersey; Mills describes Interstate 80 as a "drug corridor" and the city of Pittsburgh as a "high consumption drug area" and "source area."[192] Although this factor carries little weight standing alone,[193] our Court of Appeals has recognized the salience of

---

[192] Mills Deposition, Doc. 14-1 at 17:18-18:7.

[193] *See Wardlow*, 528 U.S. at 124 ("an individual's presence in an area of expected criminal activity, *standing alone*, is not enough to support a reasonable, particularized suspicion that the person is committing a crime,") (emphasis added); *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) ("Mere presence in an area known for high crime does not give rise to reasonable suspicion for a stop."); *United States v. Williams*, 808 F.3d 238, 248 (4th Cir. 2015) ("[A]lthough we have recognized that law enforcement officers and the trial courts are entitled to consider a motorist's use of an interstate highway as a factor in determining reasonable suspicion, we are entirely satisfied that such an observation, standing alone, is entitled to very little weight.").

this factor when placed in the context of other suspicious facts.[194] Second, Horton was driving a rental car. As confirmed both by Mills's training and experience and the pertinent case law, third-party vehicles such as rental cars are the preferred vehicles of drug traffickers because they are less traceable.[195] At the same time, the car was rented in Horton's name and there were no signs of violation of the rental agreement such as removal of the rental stickers; by making the rental vehicle *more* traceable, this blunts the suspicious character of Horton's rental car use.[196] Third, Horton was taking an overnight trip from New Jersey to Pittsburgh and back, despite the trip taking about five hours each way, which is consistent with drug trafficking.[197] And when asked if he did "anything fun" when visiting his son in Pittsburgh, Horton said "no." These facts are quite significant to the analysis, but for probable cause purposes more is required to distinguish Horton from a law-abiding citizen in the wrong place at the wrong time.

---

[194] *See United States v. Thompson*, 772 F.3d 752, 760 (3d Cir. 2014) (defendant's travel along a known drug corridor was one of several factors to support finding reasonable suspicion).

[195] Mills Deposition, Doc. 14-1 at 20:24-21:16; *United States v. Gilroy St. Patrick Stewart*, 92 F.4th 461, 470 (3d Cir. 2024) ("[T]raffickers often use vehicles owned by others to transport drugs. For that reason, we have counted the use of a third-party vehicle as a factor contributing to reasonable suspicion.").

[196] *See, e.g.*, *United States v. Hunter*, 554 F.Supp.3d 632, 641 (E.D. Pa. 2021), *rev'd on other grounds*, 88 F.4th 221 (3d Cir. 2023) (Explaining, in contrast to cases wherein the circumstances surrounding a driver's rental car use was suspicious, that "[t]here was nothing unusual about [defendant's] rental car.").

[197] *See Gates*, 462 U.S. at 243 (Explaining, in a case where officers had received an anonymous tip that defendant was making a drug run, that defendant's flight to Florida, which is "well-known as a source of narcotics and other illegal drugs," "his brief, overnight stay in a motel, and apparent immediate return north to Chicago in the family car, conveniently awaiting him in West Palm Beach, [was] suggestive of a pre-arranged drug run.")

The remaining facts relate to Horton's behavior throughout the stop. The fourth fact is that when Mills approached Horton's car, he believes that Horton was hiding behind the b-pillar of the car. Horton agrees that he was leaning back but only because "due to [his] size" he generally has the driver's seat "in its furthest or near furthest back position."[198] This factor seems to be of exceedingly minor import to a reasonable suspicion analysis, much less a probable cause analysis, because Horton's seat position was not coupled with any mannerisms showing surreptitious intent.

The fifth fact Mills points to is Horton's response to Mills's suspicion from the very beginning of the stop, namely asking if Mills thought he was "running drugs" and displaying a "confrontational demeanor." "[N]ervous, evasive behavior is a pertinent factor."[199] But the Third Circuit has acknowledged that "[i]t is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer,"[200] making an ordinary demonstration of nervousness "of limited significance" to even a reasonable suspicion inquiry.[201] To some extent, this same logic applies to Horton's "confrontational" demeanor, namely his hesitancy to consent and implications of

---

[198]   Horton Affidavit, Doc. 22-2 ¶6.
[199]   *Wardlow*, 528 U.S. at 124.
[200]   *United States v. Alvin*, 701 F.App'x 151, 155 (3d Cir. 2017) (quoting *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997))
[201]   *Wood*, 106 F.3d at 948.

racial profiling and law enforcement misconduct.[202] But I agree that these behaviors are more unusual than simple nervousness and arguably support Mills's theory that Horton was attempting to intimidate Mills out of investigating the circumstances of Horton's travel, possibly so that he would not discover evidence of criminal acts.

At the same time, an obviously alternative explanation borne out by the record is that Horton actually believed that Mills thought he was "running drugs" because he was racially profiling him and actually feared police misconduct. Horton continuously indicated his desire to create a record of the stop[203] and explicitly requested to watch Mills if a search was conducted to ensure that "nothing's planted in there."[204] This alternative explanation certainly does not obviate the suspiciousness of Horton's behavior but does reduce its significance in the absence of other suspicious facts.

---

[202] MVR Footage, Doc. 14-3 at 5:00-5:05; 8:50-9:00; 9:00-9:07; 10:45-11:00; 11:33-11:42; 12:04-12:33;  (Horton stating that Mills pulled him over for "other reasons;" that he has a "problem" when police officers are "doing the bullshit;" that Mills was trying to put him "in the system;" that officers have "too much power" and conduct stops for "B.S." reasons; that "the nature of the job" is to "suspect everyone;" that officers like Mills might be unable to "do the job effectively" because they are "afraid of everybody"). Mills Deposition, Doc. 14-1 at 23:2-18 (stating that Horton's confrontational intimidation tactics contributed to suspicion). *See Johnson*, 332 F.3d at 209 (Hostile behavior of refusing to roll down window "is different from full-blown flight and was perfectly within [plaintiff's] rights; it cannot provide cause for a reasonable suspicion of wrongdoing.").

[203] *Id.* at 7:27-7:55; 8:28-8:36; 9:20-9:49; 9:50-10:45; 24:04-25:28 (Horton putting his wife on the phone during the stop; pointing out that he did not see a body camera on Mills; stating that the camera is "my witness" and that "they took your word for it" before stops were recorded; that it is "difficult" to obtain footage from the PSP; attempting to "put [his] Facebook [Live] on" to "make sure everybody's on the up and up;")

[204] *Id.* at 22:53-22:59; 23:40-23:47.

Sixth and seventh, as to Horton stating that he did not want Mills to be suspicious, Horton's forthcoming nature regarding his travel plans, and Horton's unprompted offer to call his son, I likewise credit Mills's experience-based observation that cover stories are common at traffic stops and could therefore explain an overly expressive driver.[205] But Horton explained the length of his trip in response to Mills's statement that Horton had been speeding, so the story was not entirely unprompted, which somewhat deflates this argument under Mills's own logic.[206] Likewise, Horton offered to show Mills a picture of his son, and later offered to call his son, after Mills asked if Horton and his son had done "anything fun" that weekend, which itself followed several minutes of rather hostile interrogation over whether Horton had "tripped [himself] up" about staying at a hotel or in the dorm. In context it was clear that Mills was searching for information bearing upon the truthfulness of Horton's story.

It would also be a mistake to attach too much suspicion to a driver's vocal nature in and of itself. Mills implied that Horton was required to speak with him and answer his questions[207] and asking about a driver's travel itinerary is within the

---

[205] *See, e.g.*, *United States v. Latorre-Cacho*, 637 F.Supp. 232, 243 (M.D. Pa. 2022) (officer's observation that driver's travel plans appeared to be a rehearsed story supported reasonable suspicion), *aff'd*, No. 23-2351, 2024 U.S. App. LEXIS 11066, at *5 (3d Cir. May 6, 2024) (agreeing that this fact contributed towards reasonable suspicion).

[206] MVR Footage, Doc. 14-3 at 5:14-5:32.

[207] Mills states: "*Commonwealth v. Mimms*, you can ask the operator out of the car. Okay? So I'm asking you to come out and speak with me. Case law says you can do that." MVR Footage, Doc. 14-3 at 67:00-7:23. When Horton mistakenly believes that Mills is finished asking him

ordinary scope of a traffic stop.[208] As drivers who are evasive rather than cooperative are viewed with suspicion, one would fully expect a law-abiding citizen to be forthcoming with information so the officer will let him go. Horton's eagerness to show that he is not suspicious likely "describe[s] a very large category of presumably innocent travelers" who do not want law enforcement to believe they are suspicious.[209] I am then hesitant to attach much weight to this "cover story" theory without some basis in the substance of Horton's explanation itself.

Eighth, as the Third Circuit stated in *United States v. Green*, "contradictory or inconsistent statements may contribute to reasonable suspicion,"[210] but where such statements are not "strictly contradictory," this "limits, without defeating," their relevance; they may still be significant if they are "sufficiently confusing" to suggest that the driver is being untruthful about his travel plans.[211] Mills points to two "inconsistencies" suggesting that Horton's explanation of his travel itinerary may

---

questions, he asks: "Oh, I'm done? . . . Had enough of me, right?" MVR Footage, Doc. 14-3 at 22:03-22:14.

[208] *Garner*, 961 F.3d at 271 ("[S]ome questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop.").

[209] *Reid v. Georgia*, 448 U.S. 438, 441 (1980).

[210] *Green*, 897 F.3d at 185.

[211] *Id.*; *see, e.g.*, *United States v. Spears*, 636 F.App'x 893, 902 (5th Cir. 2016) ("[M]inor, insignificant, illusory, or reconcilable inconsistencies in a [suspect's] story are not probative of criminal activity."); *United States v. Griffin*, 109 F.3d 706, 708 n.1 (11th Cir. 1997) (stating that the Court was "underwhelmed" by "the fact that [defendant] needed directions to drive to a location to which he admittedly had been before"); *Williams*, 808 F.3d at 250 (although driver's planned return date was after the expiration of the rental agreement, this minor inconsistency was not "keyed to other compelling suspicious behavior" and so did not meaningfully contribute to reasonable suspicion, as "innocent travelers frequently extend rental agreements").

have been a cover story. First, Horton stated he stays in a hotel when he visits his son, but later stated that he slept on the couch in his son's dorm this time because he was only staying for one night. Second, that Horton said his son's name was Ithiel, but when Horton called his son the contact name said "Maji," which Horton said was a nickname based on his son's middle name Semaj.

These answers hardly seem confusing and are certainly less "puzzling" than those examined in *Green*, which themselves contributed "limited" weight to even a reasonable suspicion analysis.[212] One might nevertheless expect Horton to note, when asked if he is allowed to stay in the dorms, to state that he did so during this trip even if he usually stayed in a hotel on campus. Less can be said for the second "inconsistency;" it is not unusual to provide a relative's legal name when speaking to law enforcement. At most, then, these are the kind of statements garnering limited weight in a reasonable suspicion analysis, and therefore provide marginal support to Mills's cover story theory when assessing probable cause.

I now turn back to view the "big picture" here—the most important step in any probable cause assessment. To find that probable cause is lacking, it is not enough for a court to explain that each relevant fact, "standing alone," is "susceptible of innocent explanation;" "this kind of divide-and-conquer approach is improper."[213]

---

[212] *Green*, 897 F.3d at 185-86.
[213] *District of Columbia v. Wesby*, 583 U.S. 48, 62 (2018).

In this circumstance, however, these factors do not combine to definitively establish probable cause.

Little exists to distinguish Horton from any innocent rental car driver on Interstate 80.[214] In theory, Horton's forthcoming attempts to assuage Mills's suspicions could be consistent with the theory that Horton was offering a cover story, but because these behaviors describe a "very large category of presumably innocent travelers" who are being forthcoming because they want to leave,[215] they must interact with something in the record to rise beyond a mere hunch, much less to show a reasonable basis to believe that Horton's car contained evidence of a crime. This Mills has not done. Instead the Court is offered minor equivocations which hardly show that Horton was lying, equivocations of the sort which ordinarily occur in the common speech of innocent persons.

Horton's near-instant reaction that Mills thought he was "running drugs" and his running commentary on law enforcement misconduct are unusual, too, and more persuasively suspicious than his cooperativeness. But again, there is little evidence in the record other than Horton's atypical conduct suggesting that his car contained

---

[214] *See Williams*, 808 F.3d at 248 ("[M]any drug traffickers use interstate highways . . . but so do many more innocent motorists. Put simply, the interstate highways are the most efficient way to drive between two points in this country, particularly large cities."); *United States v. Stanger*, Nos. 23-2814 and 23-2817, 2025 U.S. App. LEXIS 2642, at *8 n.3 (3d Cir. 2025) ("[S]everal of the facts the Government cites in support of reasonable suspicion are wholly innocent . . . these factors alone or in combination add nothing to the reasonable suspicion calculation without more than appears on this record. To hold otherwise could potentially subject millions of innocent travelers to New York City to extended traffic stops.").

[215] *Reid*, 448 U.S. at 441.

evidence of criminal activity. The record also shows some evidence—Horton's car being rented in his own name, and Horton showing Mills his son's name on the University of Pittsburgh basketball roster—which makes the "cover story" theory even less likely. On this record a reasonable factfinder could conclude that Horton's fears of racial profiling and law enforcement misconduct were genuinely held, the likely cause of his loquaciousness together with his desire to be on his way for a long drive, and a far likelier explanation for his conduct than a "cover story."

Analogous cases found even reasonable suspicion to be lacking. The District of New Hampshire granted a motion to suppress, finding that similar facts—involving a nervous rental-car-driving defendant driving on a "drug corridor" who allegedly "hid" behind his car's b-pillar, had a minor inconsistency in his travel plans, and told the trooper to "look him up" to see he had no criminal record—did not even create the reasonable suspicion necessary to justify extending the stop.[216] In a similar case, the United States Court of Appeals for the Fourth Circuit found that there was no reasonable suspicion for a defendant traveling in a rental car on a known drug corridor past midnight who proffered travel plans inconsistent with the due date for return of the rental car, and who was unable to provide a permanent

---

[216] *United States v. Hernandez*, 470 F.Supp. 3d 114, 126-27 (D.N.H. 2019) (there was no reasonable suspicion to extend the stop where defendant driving a rental car on a "drug corridor" and thought to be "hiding" behind his car's b-pillar, who was "extremely nervous" when asked about his travel plans and told the Trooper he could "look him up" to see he had no criminal record, stated that he had been traveling to an outlet to buy Hollister jeans despite the outlets not having a Hollister store).

home address in New York.[217] Though the Court need not pass upon the reasonable suspicion question today, it notes these cases because reasonable suspicion is, of course, a significantly less burdensome showing than probable cause.

Regardless of whether Mills had reasonable suspicion to extend the stop, this is not the kind of evidence ordinarily establishing probable cause. For example, probable cause has been found for warrantless searches conducted pursuant to the automobile exception where a narcotics-detection dog reacted positively to the car;[218] where officers smelled marijuana emanating from the car;[219] where officers observed the defendant put drugs in the trunk of his car or purchase drugs from a confidential informant;[220] where a youth told law enforcement officers that he had exchanged sexual favors for marijuana as he left a motor home;[221] where officers found drug paraphernalia on the driver's person;[222] where law enforcement officers knew that a nervous driver with inconsistent travel plans had a secret compartment in his car and observed large rolls of cash, a beeper, and ammunition;[223] and where the corroborated tips of confidential informants indicate that drugs are in the vehicle.[224] In contrast, probable cause to believe that weapons would be found was

---

[217] *Williams*, 808 F.3d at 247.

[218] *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010).

[219] *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006).

[220] *Pennsylvania v. Labron*, 518 U.S. 928, 940 (1996) (per curiam)

[221] *California v. Carney*, 471 U.S. 386, 388, 395 (1985).

[222] *Wyoming v. Houghton*, 526 U.S. 295, 298 (1999).

[223] *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996).

[224] *United States v. Kaplan*, 526 F.App'x 208, 213-14 (3d Cir. 2013); *United States v. Singh*, 363 F.3d 347, 357 (4th Cir. 2004).

lacking where the driver was a federal fugitive and other occupants were under suspicion for trafficking in drugs, based merely on the "conventional wisdom" that such people are likely to carry weapons.[225] The quantum of evidence provided in automobile exception cases where probable cause existed was far more particularized than the kinds of generally applicable indicators, atypical demeanor, and minor equivocations present in this case.

In view of this record, it is appropriate for this question to be decided by a jury. As a reasonable jury could find that Mills lacked probable cause to search Horton's car, the search is unlawful unless Horton's consent was voluntary.

### 2.    Voluntariness of Horton's Consent to Search

The meaning of "voluntariness" in Fourth Amendment law "has reflected an accommodation of the complex of values implicated in police questioning," balancing "the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws" with "the set of values reflecting society's deeply held belief that the criminal law cannot be used as an instrument of unfairness."[226] "The ultimate test remains" whether consent is "the product of an essentially free and unconstrained choice by its maker," or whether "his will has been overborne and his capacity for self-determination critically impaired."[227] "It does not matter

---

[225] *United States v. Infante-Ruiz*, 13 F.3d 498, 502 (1st Cir. 1994).

[226] *Schneckloth v. Bustamonte*, 413 U.S. 218, 254-55 (1973).

[227] *Id.* at 225-26 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 603 (1961)).

whether a suspect actually consented, so long as a reasonable police officer would have believed that he had."[228] In other words, the defendant's subjective state of mind is only relevant to the extent that it would be objectively ascertainable. Privately held fears do not enter the analysis; observable ones do.

Consent is, accordingly, "a question of fact to be determined from the totality of all the circumstances."[229] Some of these circumstances, as summarized by the Supreme Court in *Schneckloth v. Bustamonte*, include "the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep."[230]  The "setting in which the consent was obtained," as well as "the parties' verbal and non-verbal actions" are also relevant.[231] This factor—the parties' verbal actions—is the linchpin of this Court's inquiry into Horton's voluntariness to consent. I first undertake a detailed analysis of this factor. I then place this factor within the context of the totality of the circumstances. I conclude that there is at least an issue of fact as to whether Horton's consent was involuntary here.

---

[228] *United States v. Sculco*, 82 F.Supp. 2d 410, 419 (E.D. Pa. 2000); *see also United States v. Coates*, 462 F.App'x 199, 203 (3d Cir. 2012) ("The scope of consent is measured by what a 'typical reasonable person [would] have understood by the exchange between the officer and the subject,' not the [consenting party's] subjective intent.").

[229] *Id.* at 228.

[230] *Id.* at 226 (citations omitted).

[231] *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)).

### a.    Obtaining Consent Through False Statements

In *Bumper v. North Carolina*, the Supreme Court held that where a law enforcement officer only obtains consent after falsely asserting that they possess a warrant to search, "he announces in effect that the occupant has no right to resist the search" and so "the situation is instinct with coercion."[232] The Third Circuit situated *Bumper* within *Schneckloth*'s context by observing that "*Bumper* does not establish a blanket rule that, whenever police possess an invalid search warrant or falsely claim that they can obtain one, voluntariness is necessarily vitiated; indeed, *Schneckloth* mandates consideration of all the surrounding circumstances."[233] However, "the government faces an especially heavy burden 'when evidence exists to show . . . that a defendant believed he must consent.'"[234]

The general principle is that "a misrepresentation that compels consent will weigh strongly against a finding of voluntary consent."[235] On one side of the equation, "[p]olice officers at times engage in a 'sales job' to make the alternative of consenting to search more attractive than the option of forcing the officers to obtain a search warrant," and such "attempt[s] to persuade a party 'by pointing out the potential inconvenience and distasteful impacts which the execution of a search

---

[232] 391 U.S. 543, 548-49 (1968).

[233] *United States v. Sebetich*, 776 F.2d 412, 424 (3d Cir. 1985).

[234] *Id.* at 424; *see also United States v. Noe*, 342 F.App'x 805, 807 (3d Cir. 2009) (quoting *Molt*, 589 F.2d at 1251) ("[I]t is well-established that when evidence shows that a person believes she must consent to a search, this 'weighs heavily against finding that consent was voluntarily given.'").

[235] *United States v. Griesbaum*, 185 F.App'x 186, 190 (3d Cir. 2006).

warrant may have'" are permissible and do not render consent involuntary.[236] Where an officer's "representation would not constitute deceit or trickery, but only 'a fair and sensible appraisal of the realities' facing" the defendant," such as *accurately* stating that a warrant will inevitably issue in the absence of consent or stating that an officer will *seek* a warrant without implying that it will issue, then that representation has little bearing to the voluntariness inquiry.[237]

On the other side, when a defendant "believed he must consent . . . [a]nd when that belief stems directly from misrepresentations by government agents, however innocently made," such as where officers imply that obtaining a warrant is a "foregone conclusion" where it is not, "we deem the consent even more questionable.'"[238] This is not limited to officers' false claims that they have or will inevitably obtain a warrant. In *United States v. Abreu*, for example, a state trooper inaccurately told a defendant who had repeatedly refused to consent that he had the right to open his truck to make sure a load was properly secured despite not having lawful authority to do so under the circumstances.[239] The District of New Jersey,

---

[236] *Speese v. Beyer*, Civil Action No. 1:11-CV-519, 2012 U.S. Dist. LEXIS 129821 (M.D. Pa. Aug. 8, 2012) (Methvin, M.J.), *report and recommendation adopted sub nom. Speese v. Forney*, 2012 U.S. Dist. LEXIS 129816 (M.D. Pa. Sep. 12, 2012) (quoting *United States v. Claus*, 2:09-cr-125, 2010 U.S. Dist. LEXIS 93391, at *12 (W.D. Pa. Sep. 8, 2010)).

[237] *Sebetich*, 776 F.2d at 425.

[238] *Id.* at 424 (quoting *United States v. Molt*, 589 F.2d 1247, 1251-52 (3d Cir. 1978)); *see also Noe*, 342 F.App'x at 807 ("Under such circumstances, consent might be vitiated where probable cause to support the issuance of a warrant is, in fact, lacking.").

[239] *United States v. Abreu*, Criminal No. 20-00642 (SRC), 2021 U.S. Dist. LEXIS 151732, at *34-35 (D.N.J. Aug. 12, 2021).

applying *Bumper*, held that this misleading statement impliedly coerced the defendant's consent to search, even if the trooper "did not intentionally lie to Defendant and simply misspoke."[240]

Furthermore, it is not an accurate appraisal of the realities facing the defendant to state that, if consent is not given, officers will violate the law—even if the officers fully intend on doing so. For example, when officers state that if a citizen does not consent to a search of a home, then after obtaining a warrant they will "tear the house apart," this threat of retaliatory action is outside of the officers' scope of authority and as such is not the kind of "appraisal of the realities" understood to be non-coercive in the Third Circuit.[241] In sum, when it comes to police officers strongarming consent, the Third Circuit draws a bright line between truth and falsehood. And such falsehood includes statements describing "what will happen next" if that description exceeds the scope of that officer's lawful authority.

---

[240] *Id. See also United States v. Parson*, 599 F.Supp. 2d 592, 602-609 (W.D. Pa. 2009) (falsely telling a defendant that he was the possible victim of identity theft to gain his consent to enter his house); *United States v. Escobar*, 389 F.3d 781, 786 (8th Cir. 2004) (falsely telling a defendant who had refused to consent to search that drug-detection dogs had alerted on his luggage).

[241] *See Speese*, 2012 U.S. Dist. LEXIS 129821, at *16 (collecting cases) (denying officer's motion for summary judgment on plaintiff's Section 1983 suit brought for Fourth Amendment violations where consent was only given after officers stated that they would "tear up the home" after obtaining a warrant). *See also Dice v. Johnson*, 711 F.Supp. 2d 340, 367-68 (M.D. Pa. 2010) (denying officer's motion for summary judgment on plaintiff's Section 1983 suit brought for Fourth Amendment violations where consent was only given after officers stated that refusing consent "wouldn't be in [his] best interest" and that "if they forced him to get a warrant, he will have wished that he had not done so").

Applying these principles to the instant case, the Court begins by evaluating Mills's statement to Horton: "There's a couple of ways you can go about this. It's either you say yes or no. If you say no, I can, um, we can impound the vehicle and apply for a search warrant."[242] At his deposition, Mills stated that he "missp[oke]" and "would have had to have a K9 come to the scene and do an exterior sweep."[243] Based on Mills's deposition, he appears to believe that even without the K9, he could "still impound the vehicle" "based off reasonable suspicion" of "criminal activity," despite agreeing that he lacked probable cause at this point in the search.[244] If it is false, however, that Mills could impound Horton's car in the event that Horton did not consent to search, then this falsehood would have critical importance to assessing the voluntariness of Horton's consent.

And it is a falsehood. The Fourth Amendment proscribes unreasonable seizures as well as unreasonable searches, so probable cause is of course required to seize such vehicles, even when seized pending issuance of a search warrant.[245] Yet

---

[242] *Id.* at 23:29-23:40.

[243] Mills Deposition, Doc. 14-1 at 71:15-17. But with this correction Mills's statement would still be wrong, unless the K9 actually alerted to Horton's car—that might provide the probable cause necessary to seize Horton's car, pending a warrant application, in the absence of consent. But if Mills did carry this unspoken assumption, it would be an assumption that Horton was guilty until proven innocent.

[244] *Id.* at 71:24-72:7.

[245] *Florida v. White*, 526 U.S. 559, 563-66 (1999) (probable cause to believe vehicle was forfeitable contraband required to seize it); *Chambers v. Maroney*, 399 U.S. 42, 52 (1970) ("For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. *Given probable cause to search*, either course is reasonable under the Fourth Amendment.") (emphasis added); *United States v.*

impoundment, under the "community caretaking exception," is permissible absent probable cause because "the police perform a multitude of community functions apart from investigating crime."[246] The reason for this exception guides its limitations: vehicles cannot be impounded, absent probable cause, solely to further a criminal investigation—for that would not be an impoundment at all, but a seizure of the vehicle.[247] Otherwise impoundment would simply be an end-run around the Fourth Amendment's prohibition on unreasonable seizures.

Unsurprisingly, the Pennsylvania Vehicle Code aligns with these limitations. It authorizes officers to remove vehicles in various circumstances—including when an unattended vehicle obstructs traffic, the operator is physically unable to provide for its custody, or the operator is arrested—but not to apply for a warrant.[248] So "where a defendant is stopped on the highway for a summary offense, the police have no statutory authority to impound the defendant's vehicle."[249] Absent probable

---

*Kaplan*, 526 F.App'x 208, 212-13 (3d Cir. 2013) (citing *Chambers* and requiring probable cause to seize vehicle pending issuance of search warrant).

[246] *United States v. Smith*, 522 F.3d 305, 313 (3d Cir. 2008) (quoting, and adopting the rationale from, *United States v. Coccia*, 446 F.3d 233, 238 (1st Cir. 2006)); *South Dakota v. Opperman*, 428 U.S. 364, 368-39 (1976).

[247] *See Smith*, 522 F.3d at 314 n.9 ("There is no doubt that in our case the impoundment was for community caretaking rather than investigative purposes for which probable cause would have been required."); *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996) ("An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation."); *United States v. Dickerson*, Criminal No. 1:16-CR-212, 2021 U.S. Dist. LEXIS 209740, at *10 (M.D. Pa. Oct. 29, 2021) ("*When officers have probable cause* to believe a vehicle contains contraband or evidence of a crime, they may either conduct a warrantless search of the vehicle on the street or impound the vehicle while they obtain a search warrant.") (emphasis added).

[248] 75 Pa.C.S. § 3352.

[249] *Commonwealth v. Hennigan*, 753 A.2d 245 (Pa. Super. Ct. 2000).

cause, which even Mills did not believe he had mustered, impoundment would be both unconstitutional and *ultra vires*.

In context, that means that Mills' statement—that Horton could either consent, or Mills would impound the vehicle—was false unless Mills had probable cause to seize the vehicle at the time he made this statement. And as discussed above, such probable cause was lacking. Like the misstatement in *Abreu*, Mills's misstatement here implied that in the absence of consent he had lawful authority to conduct a search or seizure where he did not. Accordingly Mills faces "an especially heavy burden" to show that Horton's consent was voluntary.[250] And placing this misstatement in the context of the stop does not reveal any basis for concluding that this especially heavy burden has been discharged. If anything, the circumstances surrounding this statement only compound the problem and indicate that the only reason Horton consented was because of this statement.

### b.    Voluntariness analysis

Consider first Horton's explicit refusal to consent due to his fear of law enforcement misconduct. Horton made clear many times throughout the stop that he believed he was being racially profiled, feared law enforcement misconduct, and suspected that Mills would plant evidence in the car.[251] He demonstrated the hold

---

[250] *Sebetich*, 776 F.2d at 424.
[251] *See* MVR Footage, Doc. 14-3 at 5:00-5:05; 8:50-9:00; 9:00-9:07; 10:45-11:00; 11:33-11:42; 12:04-12:33;  (Horton stating that Mills pulled him over for "other reasons;" that he has a "problem" when police officers are "doing the bullshit;" that Mills was trying to put him "in

these fears had over him by repeatedly drawing attention to the need to create a record of the stop.[252] And he exemplified the connective tissue between these fears and his hesitancy to consent by originally insisting that he watch any search Mills conducted, explicitly stating that he wanted to watch because Mills was "getting upset" and to "make sure nothing's planted in there."[253] Even if these fears are unfounded or paranoid, they were made explicit many times over and are Horton's explicitly stated reason for denying consent if he could not watch the search.

That a person with such fears of police misconduct and evidence-planting would refuse, refuse, and refuse again—until they are told that the car will be impounded if consent is not given—can hardly be viewed as a coincidence. Indeed, the notion that Horton only consented because he believed he had no choice is consistent with Horton's refusal to consent in other contexts: he refused to leave his car until Mills implied that he had no choice and refused to allow Mills to conduct a pat-down search.[254]

---

the system;" that officers have "too much power" and conduct stops for "B.S." reasons; that "the nature of the job" is to "suspect everyone;" that officers like Mills might be unable to "do the job effectively" because they are "afraid of everybody").

[252] *Id.* at 7:27-7:55; 8:28-8:36; 9:20-9:49; 9:50-10:45; 24:04-25:28 (Horton putting his wife on the phone during the stop; pointing out that he did not see a body camera on Mills; stating that the camera is "my witness" and that "they took your word for it" before stops were recorded; that it is "difficult" to obtain footage from the PSP; attempting to "put [his] Facebook [Live] on" to "make sure everybody's on the up and up;").

[253] *Id.* at 22:53-22:59; 23:40-23:47.

[254] MVR Footage, Doc. 14-3 at 6:57-7:23 (refusing to leave car until Mills implied Horton had no choice); 8:00-8:15 (Horton refusing to consent to pat-down search but agreeing to lift his jacket to show he has no weapons).

Moving to the request for consent itself, after Horton initially refuses to consent, Mills repeatedly asks Horton for his consent seven more times within a ten-minute timespan before Horton eventually agrees.    Several times, Horton unambiguously responds "No."[255] Horton stated multiple times that he would only consent if he could watch Mills conduct the search, for fear that Mills would plant evidence.[256] Such repeated requests tend to show that Horton's consent was not voluntary.[257] They tend to show it even more when considered in the context of Horton's fears of evidence-planting. And they tend to show it several times over when the timing of Horton's eventual consent is placed alongside the timing of Mills's false statement. It is only after Horton has refused consent thrice, and six minutes after Mills's first request for consent, that Mills states that "If you say no, I can, um, we can impound the vehicle and apply for a search warrant."[258] Under three minutes later—after Horton unsuccessfully requests to be able to watch the search be carried out again,[259] and after four more requests for consent[260]—Horton relents and consents to the search.[261] The threat of impoundment is the only thing that changed in the minutes leading up to Horton's consent.

---

[255] MVR Footage, Doc. 14-3 at 17:28-17:32 ("No. No. No."); 22:15-22:22 ("No."); 22:51-23:08 ("I really don't want you checking because now you're getting upset.").

[256] *Id.* at 22:25-22:30; 23:40-23:47.

[257] *See, e.g.*, *United States v. Clark*, Criminal Action No. 2018-0009, 2019 U.S. Dist. LEXIS 126985, at *29-34 (D.V.I. Jul. 30, 2019).

[258] MVR Footage, Doc. 14-3 at 23:30-23:40.

[259] *Id.* at 23:40-23:47.

[260] *Id.* at 23:20-23:40; 24:16-24:43; 24:50-25:10; 26:00-26:06.

[261] *Id.* at 26:00-26:06.

In this context the setting of the consent cuts both ways. Horton's consent was given at a traffic stop conducted by one officer, during daylight hours, and on a public highway, a less confining setting which ordinarily would weigh towards a finding of voluntariness.[262] Nor could any reasonable factfinder conclude that there was any threat of force. Yet it is worth reiterating that the traffic stop *was* extended for investigatory purposes by the time of Horton's consent. Mills also implied that Horton was required to speak with him as part of the stop,[263] and when Horton mistakenly believed Mills was done speaking with him, Horton's reply indicated that he had believed he was required to answer Mills's questions and also had not felt free to leave.[264] Moreover, in the context of Horton's trip this location enhanced the severity of Mills's threat of impoundment, as impoundment would have left Horton

---

[262] *See, e.g.*, *United States v. Holyfield*, No. 2:22-cr-00056, 2024 U.S. Dist. LEXIS 161870, at *43-44 (W.D. Pa. Sep. 9, 2024); *United States v. Velasquez*, 885 F.2d 1076, 1082 (3d Cir. 1989) (finding no coercion when "consent took place on the shoulder of a major highway during daylight hours").

[263] Mills states: "*Commonwealth v. Mimms*, you can ask the operator out of the car. Okay? So I'm asking you to come out and speak with me. Case law says you can do that." MVR Footage, Doc. 14-3 at 67:00-7:23. *Mimms* permits an officer to order drivers out of the car for purposes of officer safety—and may even extend to ordering the driver to stand at the officer's window—but does not extend to requiring the driver to answer investigatory inquiries unrelated to officer safety. *See United States v. Hunter*, 88 F.4th 221, 227 n.3 (3d Cir. 2023) (McKee, J. Concurring) (explaining that the Third Circuit has, including in *Hunter* itself, only extended *Mimms* in two cases: ordering drivers to raise their hands in the air while remaining in the car, and extending the length of the stop to conduct criminal record checks); *United States v. Lewis*, 20 F.3d 483, 492 (7th Cir. 2019) (extending *Mimms* to permit orders for traffic stop detainees to sit in the officer's patrol car); *United States v. Barker*, 807 F.App'x 580, 581 (8th Cir. 2020) (same).

[264] MVR Footage, Doc. 14-3 at 22:03-22:14. (Mills: "Hang up the phone." Horton: "Oh, I'm done?" Mills: "Yeah." Horton: "Had enough of me, right?" Mills: "Yeah, I think you're doing a lot of convincing and you're telling me a lot of bullcrap is what I think." Horton: "You thought I was, right?" Mills: "Yeah, so my question is, you're not gonna let me check the car?" Horton: "No.").

stranded on the highway in frigid January air, hours from his son in Pittsburgh and his home in New Jersey.[265]

In sum, Mills repeatedly asked Horton for consent to search after he had made known his reluctance to consent due to the fear of law enforcement misconduct, and then only obtained consent after falsely stating that he could impound Horton's vehicle, leaving him stranded on Interstate 80 in January and far from home. In this context a reasonable factfinder could conclude that Horton's consent to search was involuntary and given only because of the threat of unlawful impoundment.

### 3.    Qualified Immunity

Section 1983 incorporates the common law defense of qualified immunity, which generally shields "government officials performing discretionary functions . . . from civil damages liability so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[266] Mills never attempts to raise qualified immunity as to Horton's remaining claims. As to Horton's Fourth Amendment claim, Mills's briefing on qualified immunity states:

> It is not clearly established law that a vehicle cannot be pulled over for traffic violations, or that an officer can begin to establish reasonable suspicion based on Plaintiff's own actions and words. It is not clearly established law that telling someone what will happen next after initial consent is not obtained is coercion.[267]

---

[265] *See, e.g.*, *United States v. Abreu*, Criminal No. 20-00642 (SRC), 2021 U.S. Dist. LEXIS 151732, at *28-29 (D.N.J. Aug. 12, 2021).

[266] *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

[267] Brief in Support, Doc. 15 at 15-16.

Aside from the fact that Mills's request for qualified immunity on the reasonable suspicion issue is hopelessly vague, that issue is not dispositive to this motion. And Mills never requests qualified immunity on the probable cause issue. As relevant here, then, Mills appears to only request qualified immunity on the voluntariness of Horton's consent based on Mills telling him "what will happen next after initial consent is not obtained."[268]

It is frustrating to the Court that this final request for qualified immunity provides no case citations and barely attempts to define the scope of the right at issue, but I will reluctantly deem this briefing sufficiently specific to raise the defense. I shall accordingly limit my qualified immunity analysis to this issue.[269]

Qualified immunity shields officers from suit unless they "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."[270] "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."[271] "For qualified-immunity purposes, clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals."[272]

---

[268] *Id.*

[269] *See Riley v. Clark*, No. 4:20-CV-00325, 2025 U.S. Dist. LEXIS 61626, at *12-18 (M.D. Pa. Mar. 31, 2025).

[270] *Thomas v. Tice*, 948 F.3d 133, 141 (3d Cir. 2020) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

[271] *Wesby*, 583 U.S. at 63.

[272] *James v. N.J. State Police*, 957 F.3d 165, 170 (3d Cir. 2020) (cleaned up).

Here, Mills contends that "it is not clearly established law that telling someone what will happen next after initial consent is not obtained is coercion."[273] He is asking the wrong question, because Mills did not simply tell Horton "what will happen next." For it was clearly established in 2022 that Mills's statement—that he could impound Horton's vehicle if Horton did not consent to search—was false. It is clear from Supreme Court and Third Circuit authorities decided prior to 2022 that officers require probable cause to seize vehicles for the purely investigative purpose of applying for a warrant.[274] So a reasonable officer in 2022 would have known that the statement Mills used to obtain Horton's consent to search—that he would impound the vehicle pending a warrant if Horton did not consent—was false.

The Supreme Court's decision in *Bumper v. North Carolina* long ago established that "the situation is instinct with coercion" where law enforcement officers "announce[] in effect that the occupant has no right to resist the search."[275] And binding Third Circuit precedent dating back to at least 1978 applies this principle to reason that a police officer's misrepresentation inducing the defendant's belief that he "must consent," "however innocently made," weighs strongly against

---

[273] Brief in Support, Doc. 15 at 16.

[274] *See, e.g.*, *Chambers v. Maroney*, 399 U.S. 42, 52 (1970); *Florida v. White*, 526 U.S. 559, 563-66 (1999) (probable cause was required to seize a vehicle); *United States v. Kaplan*, 526 F.App'x 208, 212-13 (3d Cir. 2013) *United States v. Smith*, 522 F.3d 305, 313, 314 & n.9 (3d Cir. 2008).

[275] 391 U.S. 543, 548 (1968).

a finding of consent.[276] Under these circumstances binding Third Circuit precedent put Mills on notice that he faced an "especially heavy burden" to show that Horton's consent was voluntary where obtained through a coercive misrepresentation which made the voluntariness of Horton's consent "*even more* questionable."[277] A reasonable officer in Mills's position would therefore have been on notice, in 2022, that in the absence of compelling facts discharging this "heavy burden" Horton's consent was involuntary. And the record not only lacks any such facts but acutely exacerbates the voluntariness problem. As such, that Horton's consent was involuntary was "beyond debate" at the time of the search that followed.

### B.    First Amendment

A First Amendment retaliation claim requires "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."[278] As to this third element of causation, the retaliatory motive "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."[279] The Supreme Court has held that in the absence of a similarly situated comparator who

---

[276] *United States v. Molt*, 589 F.2d 1247, 1251-52 (3d Cir. 1978); *United States v. Sebetich*, 776 F.2d 412, 424-25 (3d Cir. 1985); *United States v. Griesbaum*, 185 F.App'x 186, 190 (3d Cir. 2006).

[277] *Sebetich*, 776 F.2d at 425 (quoting *Molt*, 589 F.2d at 1251) (emphasis added).

[278] *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)).

[279] *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).

was treated differently, a plaintiff must show that probable cause was lacking to prevail on a First Amendment retaliatory arrest claim.[280] The same would then seem to follow for a retaliatory search and seizure claim.[281]

Defendants never challenge whether Horton's speech was constitutionally protected conduct. Nor do they challenge whether Mills conducted this traffic stop search for retaliatory purposes, and whether a traffic stop search would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights.[282] Instead, Mills solely argues that probable cause was lacking to challenge the retaliation claim here.[283] Because I have already rejected Mills's argument that he had probable cause to search Horton's vehicle, his retaliation argument fails for the same reasons. So the motion for summary judgment will be denied as to this claim.

## C.    Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides: "no state shall . . . deny to any person within its jurisdiction the equal protection of the

---

[280]  *Id.* at 404, 406-407 (holding that in the absence of comparator evidence successful retaliatory arrest claims must show the absence of probable cause)

[281]  *See Humphrey v. Sec'y Pa. Dep't of Corr.*, 712 F.App'x 122, 124-25 (3d Cir. 2017) ("[A] retaliatory search and seizure may be sufficient to satisfy this prong of the claim.").

[282]  Whether a search without any seizure is sufficiently adverse to support a first amendment retaliation claim is at least unclear in the prisoner context. *Compare Burton v. Wetzel*, Civil No: 1:18-CV-01574, 2023 WL 5831848, at *7-8 (M.D. Pa. Sep. 8, 2023) (Schwab, M.J.) (collecting cases) *with Beale v. Overtone*, 2017 WL 4276747, at *2 (W.D. Pa. Sep. 27, 2017). *See also Humphrey*, 712 F.App'x at 124-25 (holding that a "retaliatory search *and seizure* may be sufficient to satisfy this prong") (emphasis added). But our Court of Appeals has cautioned that this prong of the retaliation inquiry "is an objective inquiry and ultimately a question of fact." *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012). In the absence of any briefing on this fact-intensive issue I decline to reach it.

[283]  Brief in Support, Doc. 15 at 11; Brief in Opposition, Doc. 23 at 19-20.

laws."[284] "Selective enforcement of the law, colloquially referred to as 'racial profiling,' is a violation of the Equal Protection Clause, since the Clause prohibits selective enforcement of the law based on considerations such as race."[285]

"To establish a selective enforcement claim under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he was (1) treated differently from other, similarly situated persons and (2) 'that this selective treatment was based on an unjustifiable standard, such as race.'"[286] Horton provides no such similarly situated persons but instead cites to cases holding that a comparator was not necessary.[287] But even if these cases remain good law (and that much is not clear), they were decided in the motion to dismiss context and therefore have no bearing upon the necessary showing at the summary judgment stage.[288] Indeed the

---

[284] U.S. Const. amend. xiv, §1.

[285] *Slippi-Mensah v. Mills*, No. 1:15-cv-07750-NLH-JS, 2020 U.S. Dist. LEXIS 111396, at *17 (D.N.J. Jun. 25, 2020) (cleaned up).

[286] *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (quoting *Jewish Home of E. Pa. v. Ctrs. For Medicine & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012)).

[287] Brief in Opposition, Doc. 23 at 16.

[288] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 244-45 (3d Cir. 2008) ("[T]he *Olech* decision does not establish a requirement that a plaintiff identify *in the complaint* specific instances where others have been treated differently for the purposes of equal protection.") (emphasis added); *Davila v. N. Reg'l Joint Police Bd.*, 979 F.Supp. 2d 612, 630 (W.D. Pa. 2013) ("*In pleading* discriminatory effect, the Complaint must contain sufficient facts . . . [but] is not required to identify specific instances where others have been treated differently." (emphasis added)). *But see Brooks v. State Coll. Area Sch. Dist.*, 707 F.Supp. 3d 448, 467-78 (M.D. Pa. 2023) (reviewing Third Circuit case law on allegations required to survive dismissal for Equal Protection claims); *Wolfe v. City of Sunbury*, No. 4:24-CV-00251, 2024 U.S. Dist. LEXIS 219959, at *27-30 (M.D. Pa. Dec. 5, 2024) (same).

Third Circuit has more recently stated: "the failure to identify similarly situated persons dooms an equal-protection claim."[289]

Horton correctly notes that "a facial classification by race, i.e., 'a law or policy [that] explicitly classifies citizens on the basis of race,'" does not require showing such comparators.[290] But such facial classifications are analyzed differently from situations wherein "a facially neutral law or policy is applied differently on the basis of race,"[291] because a facial classification by its terms leaves no room for an alternative explanation. Where, as here, an Equal Protection claim is premised upon the enforcement of a facially neutral law or policy, plaintiffs "must show that similarly situated individuals of a different race were treated differently."[292]

Horton nonetheless protests that this case might be "analogous" to a case involving facial classifications based on race. "Surely, if Defendant had testified, 'I pulled him over because he was black,' Plaintiff would not have to show that non-black individuals were not pulled over in similar circumstances.'"[293] Although the case law is not clear on this point, such "direct evidence of discriminatory animus"

---

[289] *Stradford v. Sec'y of Pa. Dep't of Corr.*, 53 F.4th 67, 74 (3d Cir. 2022) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006)); *see also Dombrosky v. Stewart*, 555 F.App'x 195, 197 (3d Cir. 2014) (affirming summary judgment in favor of defendants where no comparator evidence was introduced in traffic stop case).

[290] Brief in Opposition, Doc. 23 at 20 (quoting *Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543 (3d Cir. 2011)).

[291] *Lower Merion Sch. Dist.*, 665 F.3d at 543 (quoting *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005)).

[292] *Lower Merion Sch. Dist.*, 665 F.3d at 551.

[293] Brief in Opposition, Doc. 23 at 20.

in the form of an actual admission may be sufficient to survive summary judgment absent a comparator for a selective enforcement claim, and perhaps—though Horton provides no authorities so holding—less explicit forms of evidence could too.[294]

But Horton's scintilla of circumstantial evidence falls far beneath this threshold.  His argument is based solely on the contention that Mills had followed Horton and observed his conduct for about two minutes, saw Horton's race only when he pulled his car alongside Horton's, and decided to pull Horton over at that moment.[295] Horton points to the following exchange in Mills's deposition transcript while counsel was guiding Mills through the MVR Footage to contend that Mills admitted to deciding to pull Horton over upon seeing him:

> Q. Now, at this point in the video at 2 minutes and 45 seconds, it appears you pulled up even with him?
> A. Uh-huh. Correct.
> Q. And now you can see him?
> A. Correct.
> Q. Okay.
> (Whereupon, the video recording resumed playing.)
> . . .
> Q. Now, we're at – you're now dropped back and we're at 2:53, and you're still not pulling him over, correct?
> A. Correct.
> Q. But at this point, do you think you made a decision to pull him over?
> A. My decision was made, correct.

---

[294] *See Jeffers v. Kiser*, Civil Action No. 1:22-CV-1815, 2024 WL 3295594, at *4 (M.D. Pa. Jul. 3, 2024) (opining that where a plaintiff "cannot offer direct evidence of discriminatory animus" he may prevail by showing that similarly situated comparator were treated differently). *See also Anderson v. Wachovia Mortg. Grp.*, 621 F.3d 261, 268-69 (3d Cir. 2010) (holding in the *McDonnell Douglas* employment discrimination context that "comparative evidence," while "often highly probative of discrimination, [] is not an essential element of a plaintiff's case.").

[295] Brief in Opposition, Doc. 23 at 20-21.

Q. Okay.[296]

Mills's statement is not an admission of racially motivated policing and cannot reasonably be interpreted as such. Mills does not testify that he decided to pull Horton over *because* he saw him, nor, as Horton contends, does he even testify that he decided to pull Horton over *when* he saw him. Mills states that his "was made" by the time he had dropped back, not at the exact moment he saw Horton. Moreover, the undisputed record shows that Mills initially decided to follow Horton in the first place when he could *not* see Horton.[297]

Though Horton cites to cases in which "an officer uses a racial slur" in support of his contention that he need not "show that non-black individuals were not pulled over in similar circumstances," his authorities prove the opposite.[298] In *Harvard v. Cesnalis* the Third Circuit held that summary judgment should be denied in a case brought for selective enforcement.[299] Racial slurs were used against the plaintiff and yet the Third Circuit still analyzed the sufficiency of plaintiff's comparator evidence. The *Harvard* court reversed because the district court's comparator analysis was too demanding—not because it demanded a comparator in the first place.[300] In Horton's

---

[296]  Mills Deposition, Doc. 14-1 at 31:22-32:14.
[297]  Mills Deposition, Doc. 14-1 at 11:9-12:2.
[298]  Brief in Opposition, Doc. 23 at 21 (citing *Harvard v. Cesnalis*).
[299]  973 F.3d at 205-207.
[300]  *Id.*

case his scintilla of evidence falls well below that in *Harvard* wherein comparator evidence was still required.

Accordingly, I need not determine when, or if, sufficiently overwhelming direct evidence of race-based policing might obviate the need for a comparator for a selective enforcement claim. That's certainly not the case here. Because the scintilla of circumstantial evidence provided by Horton is insufficient to create an issue of fact as to whether Mills subjected Horton to differential treatment based on his race in the absence of a similarly situated comparator, I will grant summary judgment in Mills's favor on this count.

## V.    CONCLUSION

There is at least an issue of fact as to whether Mills had probable cause to search Horton's vehicle, and whether Horton voluntarily consented to the search following Mills's statement that he would impound the vehicle if Horton did not consent. I deny summary judgment as to Horton's Section 1983 Fourth Amendment unlawful search claim and Section 1983 First Amendment retaliation claim. I grant summary judgment as to Horton's Section 1983 Fourteenth Amendment Equal Protection claim, as well as his false arrest and false imprisonment claims brought under Pennsylvania state tort law.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge